The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
August 9, 2018

## 2018COA113

**No. 15CA1713, People v. Davis — Criminal Law — Sentencing
— Juveniles; Constitutional Law — Eighth Amendment — Cruel
and Unusual Punishments**

A division of the court of appeals considers the
constitutionality of a juvenile offender's sentence to life with the
possibility of parole after forty years (LWPP-40) plus a consecutive
eight years and one day.  The division considers and rejects the
defendant's contentions that (1) the consecutive sentences imposed
by the trial court violated the Eighth Amendment to the United
States Constitution; (2) his sentence to LWPP-40 was
unconstitutional because the statutory scheme under which he was
sentenced mandated that juveniles receive the same sentence as
adults; and (3) Colorado's parole system violates the Eighth
Amendment to the United States Constitution as interpreted by the

Supreme Court in *Graham v. Florida,* 560 U.S. 48 (2010), and *Miller v. Alabama,* 567 U.S. 460 (2012), because it does not provide juveniles sentenced to LWPP-40 a meaningful or realistic opportunity for release.

The division also rejects the defendant's contentions that (1) the trial court erred in denying his motion to suppress statements made during police interrogation and (2) he did not validly waive his right to testify.

Accordingly, the division affirms the district court's denial of the defendant's Crim. P. 35(c) motion.

COLORADO COURT OF APPEALS                                        **2018COA113**

Court of Appeals No. 15CA1713
City and County of Denver District Court No. 86CR2489
Honorable Brian Whitney, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Eric Dwight Davis,

Defendant-Appellant.

ORDERS AFFIRMED

Division I
Opinion by JUDGE TAUBMAN
Welling and Davidson*, JJ., concur

Announced August 9, 2018

Cynthia H. Coffman, Attorney General, Elizabeth Rohrbough, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Eric A. Samler, Hollis A. Whitson, Alternate Defense Counsel, Denver,
Colorado, for Defendant-Appellant


*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2017.

¶ 1     Defendant, Eric Dwight Davis, appeals the district court's orders denying his Crim. P. 35(c) motion for postconviction relief. We affirm.

## I.  Background

¶ 2     In 1986, when Davis was seventeen years old, he and Thomas McGrath robbed the victim, McGrath's former coworker.  The victim was transporting money to a bank from the restaurant at which he and McGrath had worked.  In the course of the robbery, the victim was shot and killed.

¶ 3     Davis was charged with and convicted by a jury of first degree murder after deliberation, felony murder, aggravated robbery, aggravated motor vehicle theft, conspiracy to commit first degree murder, and conspiracy to commit aggravated robbery.  As required by statute, the trial court sentenced him to life in the custody of the Department of Corrections with the possibility of parole after forty years (LWPP-40) on the murder after deliberation count. Additionally, the trial court imposed a consecutive sentence of eight years and one day on the aggravated robbery count.  The sentences imposed for the remaining counts were ordered to run concurrently with the sentences to life plus eight years and a day.

¶ 4    On direct appeal, a division of this court concluded that the trial court had erred in entering two murder convictions for the death of the same victim. Thus, the division remanded to the trial court to merge the felony murder conviction with the conviction for murder after deliberation. *People v. Davis*, (Colo. App. No. 87CA0713, July 6, 1989) (not published pursuant to C.A.R. 35(f)). In all other respects, the division affirmed.

¶ 5    In 2003, Davis filed a Crim. P. 35(c) motion.[1] The district court did not rule on that motion, but appointed Davis counsel at his request. In 2013, Davis filed a second motion under Crim. P.

_____

[1] Davis filed this Crim. P. 35(c) motion over fourteen years after his convictions were affirmed on appeal. However, the People do not argue on appeal that his motion was time barred under Crim. P. 35(c)(3)(I). Moreover, the record does not indicate that the People responded to Davis's 2003 motion, much less that they argued it was time barred. Thus, we need not consider any argument that Davis's motion was untimely. *See People v. St. John*, 934 P.2d 865, 866 (Colo. App. 1996) (agreeing with the defendant "that the People ha[d] waived the time bar because they did not raise it in the trial court" and noting that "failure to attack a conviction in a timely manner does not implicate the jurisdiction of the courts to resolve a defendant's contentions"). In any event, under 16-5-402(1), C.R.S. 2017, there is no time limitation on Davis's collateral attack on his class 1 felony conviction. We would therefore consider the merits of his collateral attack on his first degree murder conviction even assuming his motion was time barred as to the other convictions.

35(a) and (c).[2] The 2013 motion, as relevant here, raised three claims: (1) the trial court erred in denying Davis's motion to suppress statements made during police interrogation, a renewal of an argument he first raised in his 2003 motion; (2) Davis did not validly waive his right to testify; and (3) Davis's sentence violated the Eighth Amendment to the United States Constitution.

¶ 6    In a series of three orders and following an evidentiary hearing on Davis's claim regarding his right to testify, the district court denied Davis's motion.  The district court also denied Davis's request to reconsider one of those orders.

## II.  Standard of Review

¶ 7    The denial of a Crim. P. 35 motion is an issue of law we review de novo.  *People v. Davis*, 2012 COA 14, ¶ 6, 272 P.3d 1167, 1169. To the extent we review the district court's findings of fact, we defer to those findings "so long as they are supported by the record." *People v. Stovall*, 2012 COA 7M, ¶ 18, 284 P.3d 151, 155.

---

[2] Although his 2013 motion was captioned as one under Crim. P. 35(a) and (c), Davis does not make any argument on appeal specific to Crim. P. 35(a).  Instead, he focuses his argument on Crim. P. 35(c).  In any event, the distinction between these provisions does not affect our analysis.

¶ 8     With respect to the constitutional arguments raised in Davis's

Crim. P. 35(c) motion, "we address the claims using the same

standards that would have applied had the issues been raised on

direct appeal." *Dunlap v. People*, 173 P.3d 1054, 1062 (Colo. 2007),

*as modified on denial of reh'g* (July 2, 2007).

¶ 9     At the outset, we note that Davis contends, the People

concede, and we agree that the district court erred in concluding

that any of his claims were procedurally barred by Crim. P.

35(c)(3)(VII) because Davis could have raised them on direct appeal.

When Davis filed his motion in 2003, that section had not yet been

added to Crim. P. 35(c).  *See Dunlap*, 173 P.3d at 1062 n.4.

Therefore, that provision does not bar his claim, and we review his

contention on the merits.

### III.  Motion to Suppress

¶ 10    Davis contends that the trial court violated his constitutional

rights when it denied his motion to suppress statements he made

during police interrogation.  We perceive no basis for reversal.

### A.  Additional Facts

¶ 11    Davis was arrested in Miami, Florida, about two weeks after

the murder.  A Miami detective advised him of his rights under

4

*Miranda v. Arizona,* 384 U.S. 436 (1966), which he waived.  During the subsequent interrogation, Davis maintained that he had not been at the scene of the murder and did not know that the victim had been killed.  Instead, he averred that McGrath had come to a hotel at which Davis was staying and the two had decided to move to Miami to start a business.  Davis admitted that he and McGrath had attempted to rob the victim about a week before the murder, but stated that he had changed his mind and did not go through with the plan.  Before the Miami detective audio recorded any of Davis's statements, Davis asked to speak to a lawyer.  The Miami detective stopped the interrogation following that request.

¶ 12     A week later, Davis was transferred to the Denver jail.  A Denver detective went to the jail to speak with Davis.  The detective did not know that Davis had invoked his right to counsel while speaking with the Miami detective.

¶ 13     When the Denver detective arrived at Davis's cell, Davis "indicated that he had been involved with quite a number of different detectives and police personnel" and wanted to clarify the Denver detective's role.  After the detective confirmed that he was leading the homicide investigation, Davis asked whether McGrath

had been arrested. The detective told Davis that McGrath had been arrested and had given a video-recorded statement. After Davis asked what McGrath had said, the Denver detective responded that he could not discuss the case until they reached the Denver Police Department. Davis then indicated that he wanted to "tell . . . his side of the story."

¶ 14    After they arrived at the police headquarters, the detective advised Davis of his *Miranda* rights, which he waived. Davis then made video-recorded statements. He once again denied any involvement in the murder, but admitted stealing the car the shooters were seen driving (as well as other cars) and helping McGrath buy the murder weapon.

¶ 15    Davis moved to suppress the statements made to the Denver detective, arguing that the Denver detective had violated his right to counsel by continuing the interrogation after he asked for an attorney. Following a suppression hearing, the trial court denied the motion. The trial court found that the statements were admissible because Davis had voluntarily reinitiated the interrogation by asking the Denver detective whether McGrath had been arrested. The video of his interrogation with the Denver

detective was played to the jury at trial, and both the Miami and Denver detectives testified.

¶ 16    With respect to this issue, the district court denied Davis's postconviction claim on procedural grounds because Davis could have raised the suppression issue on direct appeal. *See* Crim. P. 35(c)(3)(VII). Thus, the district court did not address the claim on the merits.

## B. Standard of Review

¶ 17    In considering a trial court's ruling on a motion to suppress, we review questions of law de novo but defer to its findings of fact. *People v. Bradshaw*, 156 P.3d 452, 455 (Colo. 2007).

¶ 18    We review preserved errors of constitutional dimension for constitutional harmless error. *Hagos v. People*, 2012 CO 63, ¶ 11, 288 P.3d 116, 119. Under that standard, we will not reverse if the error was harmless beyond a reasonable doubt. *Id.* In assessing whether the erroneous admission of a defendant's statement was harmless, "an appellate court should consider a number of factors, including the importance of the statements to the prosecution's case, whether the statements were cumulative, and the overall

strength of the prosecution's case." *People v. Melanson*, 937 P.2d 826, 833 (Colo. App. 1996).

## C.  Applicable Law

¶ 19    The Fifth Amendment privilege against self-incrimination includes the right to have counsel present during custodial interrogation.  *Miranda*, 384 U.S. at 470; *see also People v. Redgebol*, 184 P.3d 86, 99 (Colo. 2008).  When a suspect unequivocally and unambiguously invokes his or her right to counsel during interrogation, the police must scrupulously honor that request and cease all interrogation until the suspect has consulted with counsel or voluntarily reinitiates communication with the police.  *See Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981); *see also Redgebol*, 184 P.3d at 99; *Bradshaw*, 156 P.3d at 457.

¶ 20    For a suspect to reinitiate communication, he or she must "evince[] a willingness and a desire for a generalized discussion about the investigation."  *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983).  In contrast, the suspect's comment or question cannot constitute "merely a necessary inquiry arising out of the incidents of the custodial relationship."  *Id.* at 1046.

## D. Analysis

¶ 21　Davis contends that his constitutional rights under the Fifth Amendment were violated by the admission of his statements to the Denver detective.

¶ 22　Even if we assume that the trial court erred in admitting Davis's statements to the Denver detective, we conclude that any error was harmless beyond a reasonable doubt for the following reasons.

¶ 23　First, Davis does not challenge the admissibility of his statements to the Miami detective. The statements to the Denver detective were partially duplicative of his statements made to the Miami detective. To the extent the statements overlapped, any error in admitting the Denver statements was harmless beyond a reasonable doubt because the Miami statements were admissible in any event.

¶ 24　Second, the statements were exculpatory as to the most serious offenses. While Davis admitted to stealing the Camaro the shooters were seen driving and attempting to rob the victim a week before the shooting, he consistently denied any involvement in the murder.

¶ 25    Third, as the People contend, the evidence against Davis on all of the charges was overwhelming.  According to an eyewitness's testimony, two men were riding in a blue Camaro on the morning of October 27, 1986.  They drove next to the victim's car, a white Corvette.  Shots were fired from the passenger side of the Camaro toward the driver of the Corvette.  After the Corvette came to a stop, the man in the passenger side of the Camaro ran to the Corvette, leaned into the car, and ran back to the Camaro.  The eyewitness identified Davis as the Camaro passenger.  A second eyewitness also identified Davis as the man who had run from the Corvette to the Camaro after the shooting.

¶ 26    The People also presented testimony from patrons of a fitness center.  Those witnesses' testimony tended to show that McGrath and a friend matching Davis's description had stolen the blue Camaro from the fitness center parking lot a week before the murder.  Further, numerous witnesses testified that they had seen Davis and sometimes McGrath driving the stolen Camaro.  A witness testified that, shortly after the murder, he saw McGrath throw an object into the Platte River from the passenger side of a

dark vehicle. The object was later confirmed to be the pistol that had been used as the murder weapon.

¶ 27    Additionally, a former classmate of Davis testified that, about an hour after the murder, she saw Davis and McGrath at Stapleton Airport, where the witness worked as a ticket counter agent. Davis showed the former classmate a wad of cash in his pocket, asked for a ticket to Miami, and said that he and McGrath needed to leave Colorado quickly. The People also called two witnesses with whom Davis had stayed in Miami before his arrest. Both witnesses said that Davis told them he had killed someone. The first witness acknowledged that immediately after Davis admitted committing the murder, he changed his statement and said that his friend had killed someone.

¶ 28    Moreover, the defense stipulated to several key pieces of evidence. The parties stipulated that Davis had used a borrowed driver's license to purchase the murder weapon two days before the murder. They also stipulated that Davis's fingerprints were found in the blue Camaro, though the stipulation stated that Davis had been in the Camaro numerous times before the date of the murder.

¶ 29    Accordingly, even if we assume the trial court erred in denying Davis's motion to suppress his statements to the Denver detective, we conclude any error was harmless beyond a reasonable doubt in light of the relative insignificance of the statements to the People's case and the substantial evidence of guilt.

## IV.  Waiver of the Right to Testify

¶ 30    Davis contends that reversal is required because he never executed an on-the-record waiver of his right to testify.  We disagree.

### A.  Additional Facts

¶ 31    After the People rested, the trial court engaged in the following exchange with Davis:

> THE COURT: I'm going to read you some rights that you have with regard to testifying.  If you don't understand what I'm saying to you, say so.  I'll try to explain it.  All right.  This is all on the record.
>
> THE DEFENDANT: Okay.
>
> THE COURT: I want you to understand that you have the right to testify.  Do you understand that?
>
> THE DEFENDANT: Yes.
>
> THE COURT: If you want to testify, no one can stop you from doing so, not even your

attorney.  And you can do so even if your attorney advises you not to do so.  Do you understand that?

THE DEFENDANT: Yes.

THE COURT: All right.  But if you do so, the prosecution will be allowed to cross-examine you.  If you have been convicted of a felony, the prosecutor will, A, be entitled to ask you about it, and, B, that fact will thereby be disclosed to the jury.  Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Now, if the felony conviction is disclosed to the jury, then the jury can be instructed by the Court only that they can – only that the conviction bears upon your credibility as a witness.  Do you understand that?

THE DEFENDANT: Yes.

THE COURT: You are advised that you have the right not to testify.  If you do not testify, the jury can be advised about that right, too, which they have no business considering one way or the other with regard to that.  Do you understand that?

THE DEFENDANT: I do.

THE COURT: Any questions?

THE DEFENDANT: No sir.

¶ 32    The prosecutor then asked the trial court if it would "inquire if [Davis] ha[d] made up his mind" about testifying, to which the trial court responded, "It's none of my business."  The trial court further advised Davis, "Do you understand if you do take the stand, I will at this time find that you do take the stand having been advised of your *Curtis* rights, . . . and that you do so knowingly and willfully, okay?"  Davis responded, "Yes."  The defense called one witness and then rested.  Davis did not testify.

¶ 33    In his 2013 Crim. P. 35(c) motion, Davis alleged generally that he would show at an evidentiary hearing that he had wanted to testify at trial.  The district court granted his request for a hearing, at which the People called Davis's trial counsel as a witness.  He testified that he had no specific recollection of how he had advised Davis twenty-eight years earlier as to the right to testify.  However, he testified that if he disagreed with clients who wished to take the stand, he would generally do his "very best to dissuade them" but would not "explicitly prohibit" a client from testifying in his or her defense.  He stated:

> I've screamed at clients to try to persuade
> them not to testify when they've wanted to
> testify.  I mean, it's -- it's often -- it's quite

> often a question that a defense attorney feels
> very strongly about. So there would have to be
> a pretty good tussle that goes on before the
> client ultimately took the stand against my
> advice.

Davis did not testify at the hearing or present any evidence.

¶ 34    The district court concluded that Davis had been adequately advised of his right to testify and that the People had proved that he knowingly, voluntarily, and intelligently waived that right.

## B. Standard of Review

¶ 35    We review de novo whether a waiver of a constitutional right was knowing, voluntary, and intelligent but defer to the trial court's findings of fact. *See Sanchez-Martinez v. People*, 250 P.3d 1248, 1254 (Colo. 2011) (reviewing validity of guilty plea); *see also People v. Hardin*, 2016 COA 175, ¶ 39, 405 P.3d 379, 386 (deferring to postconviction court's determinations as to the "weight and credibility to give to the testimony of witnesses at a Crim. P. 35(c) hearing").

## C. Applicable Law

¶ 36    A criminal defendant has a right to testify in his or her own defense under the Due Process Clauses of the United States and

Colorado Constitutions.  U.S. Const. amend. XIV; Colo. Const. art. II, § 25.

¶ 37    In *People v. Curtis*, the Colorado Supreme Court held:

> A trial court exercising appropriate judicial concern for the constitutional right to testify should seek to assure that waiver is voluntary, knowing and intentional by advising the defendant outside the presence of the jury that he has a right to testify, that if he wants to testify then no one can prevent him from doing so, that if he testifies the prosecution will be allowed to cross-examine him, that if he has been convicted of a felony the prosecutor will be entitled to ask him about it and thereby disclose it to the jury, and that if the felony conviction is disclosed to the jury then the jury can be instructed to consider it only as it bears upon his credibility.  In connection with the privilege against self-incrimination, the defendant should also be advised that he has a right not to testify and that if he does not testify then the jury can be instructed about that right.

681 P.2d 504, 514 (Colo. 1984) (footnote omitted).  Thus, as the supreme court stated in *Roelker v. People*, "[t]he actual holding of *Curtis* limits the trial judge's responsibility to advising the defendant of his right to testify and the consequences of doing so." 804 P.2d 1336, 1338 (Colo. 1991).  While the *Curtis* court noted that "'the best means of demonstrating the defendant's state of

mind are his own declarations' on the record," 681 P.2d at 515 (quoting *State v. Noble*, 514 P.2d 460, 462 (Ariz. 1973)), the *Roelker* court rejected the idea that "the dictum of *Curtis* mandates a rigid requirement that the trial court question the defendant to determine whether his waiver is truly voluntary," 804 P.2d at 1339.

¶ 38    In *People v. Blehm*, the supreme court reaffirmed the need for the five-part *Curtis* advisement, but modified the *Curtis* holding to clarify that a defendant could bring a claim alleging invalid waiver of his or her right to testify only in postconviction proceedings. 983 P.2d 779, 792 (Colo. 1999). The *Blehm* court further explained that, in postconviction proceedings, "an evidentiary hearing is available if necessary to ascertain facts not present in the original trial record." *Id.* However, the court stated, "[w]here the trial court's on-the-record advisement includes the five essential *Curtis* elements, the record conclusively demonstrates that the defendant made a valid waiver of the right to testify." *Id.* Thus, under *Blehm*, a defendant would not be entitled to an evidentiary hearing in those cases in which he or she received an adequate *Curtis* advisement. *Id.*

¶ 39    Recently, however, the supreme court modified the procedure it had set forth in *Blehm*. In *People v. Moore*, the court clarified that, despite statements to the contrary in *Blehm*, the adequacy of a *Curtis* advisement is not dispositive of whether a defendant validly waived his or her right to testify. 2014 CO 8, ¶¶ 22-28, 318 P.3d 511, 519-20. Thus, when

> challenging under Crim. P. 35(c) the validity of the waiver that appears in the trial court record, the defendant, in order to obtain an evidentiary hearing, must allege specific facts that if proved at the hearing establish a prima facie case that the waiver of the right to testify was not knowing, voluntary, and intelligent.

*Id.* at ¶ 23, 318 P.3d at 519. If the defendant alleges sufficient facts to warrant an evidentiary hearing, "the prosecution bears the burden of demonstrating that [the] defendant's waiver was knowing, voluntary, and intelligent." *Id.*

¶ 40    At the evidentiary hearing, the parties may present any evidence relevant to the issue of whether the defendant's waiver was knowing, voluntary, and intelligent, including evidence of "what the defendant did or did not understand in waiving the right; what the attorney did or did not say; and any other pertinent circumstances

18

relating to defendant's condition at the time of the waiver." *Id.* at ¶ 26, 318 P.3d at 520.

### D. Analysis

¶ 41    Davis contends that the absence of an on-the-record waiver of his right to testify mandates reversal.  In response, the People contend that the trial court gave Davis an adequate *Curtis* advisement, and he has not presented any evidence that his implicit waiver of his right to testify was not knowing, voluntary, or intelligent.  We agree with the People.

¶ 42    First, we disagree with Davis's argument that the lack of an on-the-record waiver mandates reversal.  In support of his contention, Davis relies on a footnote in *Moore* in which the court stated, "If there is no record of defendant having waived the fundamental right to testify, the court of appeals on direct review may reverse the conviction and order a new trial."  ¶ 22 n.6, 318 P.3d at 519 n.6.

¶ 43    Contrary to Davis's position, we conclude that that footnote is not dispositive here.  It is not clear that the footnote in *Moore* even applies in this case given that Davis raised this claim in a postconviction motion rather than on direct appeal.  In any event,

we do not read that footnote as mandating that the trial court expressly ask a defendant whether he or she waives the right to testify after going through the *Curtis* litany. As the supreme court first made clear in *Curtis*, the five-part advisement serves as a safeguard to ensure that a defendant's waiver of the right to testify is voluntary, knowing, and intelligent. 681 P.2d at 514. Thus, the advisement itself functions as the on-the-record waiver. As a result, the trial court is not obligated to go beyond the advisement and "ask the defendant personally, on the record, whether he wishes to waive his right."[3]  *Roelker*, 804 P.2d at 1338.

¶ 44    Further, we agree with the People that the record here shows that Davis validly waived his right to testify. Davis does not dispute that the trial court's *Curtis* advisement was adequate. At the evidentiary hearing, Davis presented no evidence to show that, despite the proper *Curtis* advisement, his waiver was nonetheless invalid. Although he claimed in his Crim. P. 35(c) motion that he

---

[3] At the same time, nothing in *People v. Curtis*, 681 P.2d 504 (Colo. 1984), or its progeny *prohibits* a trial court from asking point blank whether a defendant has chosen to waive his or her right to testify. Thus, there is no legal support for the trial court's assertion here that it was "none of [its] business" whether Davis had waived his right to testify.

would present evidence demonstrating that he had wanted to testify at trial but was prevented from doing so, Davis did not testify at the evidentiary hearing or present any other evidence to support that claim. In contrast, the People presented the testimony of Davis's trial counsel, who stated that he would do his "very best" to dissuade clients from testifying if he did not think it was in their best interests, but also testified that he would not prevent clients from taking the stand if they chose to do so.

¶ 45    Thus, we determine that the district court did not err in concluding that Davis knowingly, voluntarily, and intelligently waived his right to testify.

## V. Constitutionality of the Sentence

¶ 46    Davis next contends that his sentence of LWPP-40 together with a sentence of eight years plus one day is unconstitutional. He makes several, somewhat related, arguments as to the unconstitutionality of his sentences. We address and reject each in turn.

## A. Standard of Review

¶ 47    We review constitutional challenges to sentencing determinations de novo. *Lopez v. People*, 113 P.3d 713, 720 (Colo.

21

2005), *as modified on denial of reh'g* (June 27, 2005).  To the extent

Davis challenges the trial court's discretionary sentencing

determination, "[a] trial court has broad discretion over sentencing

decisions, and will not be overturned absent a clear abuse of that

discretion."  *Id.*

## B.  Applicable Law

### 1.  Juvenile Life Sentences

¶ 48      Within the last decade, the Supreme Court has addressed the

constitutionality of sentencing juveniles to life without parole

(LWOP) in three significant cases.  First, in *Graham v. Florida*, the

Court held that juveniles convicted of nonhomicide offenses could

not constitutionally be sentenced to LWOP.  560 U.S. 48, 74 (2010).

The *Graham* Court cautioned that a state "is not required to

guarantee eventual freedom to a juvenile offender convicted of a

nonhomicide crime."  *Id.* at 75.  However, the state must provide

such juveniles "some meaningful opportunity to obtain release

based on demonstrated maturity and rehabilitation."  *Id.*

¶ 49      Second, in *Miller v. Alabama*, the Supreme Court extended

*Graham*, holding "that the Eighth Amendment forbids a sentencing

scheme that mandates life in prison without possibility of parole for

juvenile offenders" convicted of homicide.  567 U.S. 460, 479 (2012).  As the *Miller* Court stated, "Mandatory [LWOP] for a juvenile precludes consideration of his chronological age and its hallmark features — among them, immaturity, impetuosity, and failure to appreciate risks and consequences."  *Id.* at 477; *see also id.* at 465 ("Such a scheme prevents those meting out punishment from considering a juvenile's 'lessened culpability' and greater 'capacity for change . . . .'" (quoting *Graham*, 560 U.S. at 68, 74)).

¶ 50    Finally, in *Montgomery v. Louisiana*, the Court held that *Miller* announced a substantive rule of constitutional law and applied its holding retroactively.  577 U.S. ___, ___, 136 S. Ct. 718, 736 (2016).

### 2.  Colorado Sentencing Scheme

¶ 51    Between 1985 and 1990, a class 1 felony was punishable by a mandatory minimum sentence of life, which was defined by statute as LWPP-40.  § 18-1-105(4), C.R.S. 1985 ("As to any person sentenced for a class 1 felony, for an act committed on or after July 1, 1985, life imprisonment shall mean imprisonment without the possibility of parole for forty calendar years."); *see also* § 18-1.3-401(4)(a), C.R.S. 2017.  That version of the statute did not differentiate between adults and juveniles.

23

¶ 52    In 1991, the statute was amended to define a life sentence as LWOP. § 18-1-105(4), C.R.S. 1991 ("As to any person sentenced for a class 1 felony, for an act committed on or after July 1, 1990, life imprisonment shall mean imprisonment without the possibility of parole."); *see also* § 18-1.3-401(4)(a), C.R.S. 2017. As with the prior version, the 1991 version of the statute did not differentiate between adults and juveniles.

¶ 53    In 2006, the legislature again amended the statute. Under this version, a juvenile convicted of a class 1 felony committed on or after July 1, 2006, must be sentenced to LWPP-40.[4] § 18-1.3-401(4)(b)(I) ("[A]s to a person who is convicted as an adult of a class 1 felony following direct filing of an information or indictment . . . the district court judge shall sentence the person to a term of life imprisonment with the possibility of parole after serving a period of forty years . . . ."); *see also* § 18-1.3-401(4)(b)(II). In contrast, an

---

[4] As Davis notes, the 2006 provision provides that a juvenile convicted of a class 1 felony is eligible for parole "after serving a period of forty years, less any earned time." § 18-1.3-401(4)(b)(I), C.R.S. 2017. The pre-1991 version did not provide for the grant of earned time credit toward the mandatory forty-year period. However, neither party here asserts that this difference between the statutes is significant to its argument.

24

adult convicted of a class 1 felony must be sentenced to a mandatory minimum of life imprisonment. § 18-1.3-401(1)(a)(V). Thus, as the supreme court summarized, "Essentially, the legislature went back to the 1985 definition of a life sentence, but only for juveniles." *People v. Tate*, 2015 CO 42, ¶ 34, 352 P.3d 959, 967, *overruled on other grounds by Montgomery*, 577 U.S. ___, 136 S. Ct. 718.

¶ 54    In the wake of *Miller* and *Montgomery*, the General Assembly did not immediately act to remedy the unconstitutional sentences of those juveniles sentenced to LWOP for class 1 felonies committed between July 1, 1990, and June 30, 2006.[5]  Therefore, the supreme court filled the legislative gap and held that, for such juveniles, "[i]f the trial court should determine, after an individualized sentencing process, that LWOP is not warranted, the appropriate sentence . . . is life in prison with the possibility of parole after forty years." *Tate*,

---

[5] In 2016, the General Assembly enacted statutes to provide for a lesser sentence for juveniles convicted of a class 1 felony for crimes committed between 1990 and 2006.  *See* § 18-1.3-401(4)(c), C.R.S. 2017; *see also* §§ 16-13-1001 to -1002, C.R.S. 2017.  The new statutes also provided for a lesser sentence of thirty to fifty years in some circumstances for juveniles convicted of felony murder or extreme indifference murder.  *See* § 18-1.3-401(4)(c)(I)(A).

¶ 7, 352 P.3d at 963. The supreme court reasoned that LWPP-40 "is the sentence that was in place both before and after the mandatory LWOP scheme . . . — that is, before 1990 and after 2006."[6] *Id.* Because *Miller* did not "go so far as to declare LWPP unconstitutional as applied to juveniles," the supreme court concluded that LWPP-40 was "not only [an] appropriate sentence but also a constitutional one." *Id.* at ¶ 50, 352 P.3d at 970.

## C. Analysis

### 1. Consecutive Sentences

¶ 55   Davis contends that his sentence is unconstitutional because the trial court imposed consecutive sentences of LWPP-40 and eight years and one day. We perceive no constitutional infirmity.

---

[6] In *People v. Tate*, 2015 CO 42, 352 P.3d 959, *overruled in part by Montgomery v. Louisiana*, 577 U.S. ___, ___, 136 S. Ct. 718, 736 (2016), the supreme court referred to the period in which unconstitutional LWOP sentences were imposed on juvenile offenders as between 1990 and 2006. As we note, the General Assembly amended the relevant subsection of section 18-1-105 in 1991, but applied the amendment retroactively to class 1 felonies committed on or after July 1, 1990. *See* Ch. 73, sec. 5, § 18-1-105(4), 1991 Colo. Sess. Laws 404. The *Tate* court referred to this amendment as the "1990 provision." Because the statute was amended in 1991, we refer to the "pre-1991" statutory scheme, though we acknowledge that the 1991 amendment applied to offenses committed on and after July 1, 1990.

¶ 56     To the extent Davis contends that the mandatory forty years of his LWPP-40 sentence taken together with the mandatory eight years and one day sentence constitutes a de facto LWOP sentence, we conclude this argument has been foreclosed by the supreme court's decision in *Lucero v. People*, 2017 CO 49, 394 P.3d 1128. There, the court held that "neither *Graham* nor *Miller* applies to an aggregate term-of-years sentence."[7]  *Id.* at ¶ 4, 394 P.3d at 1130. Thus, even if a juvenile defendant is sentenced to multiple lengthy term-of-years sentences, *Graham* and *Miller* do not apply because term-of-years sentences are distinct from a sentence of LWOP.  *Id.*

¶ 57     To the extent that Davis argues that the trial court abused its discretion as to the sentences imposed for the nonhomicide charges, we similarly disagree.  Davis contends that the trial court was not required to order the eight years and one day sentence to run consecutively to his LWPP-40 sentence.  However, that determination was within the broad discretion of the trial court, and

---

[7] The People contend that *Lucero v. People*, 2017 CO 49, 394 P.3d 1128, completely forecloses Davis's arguments that his sentence violates the Eighth Amendment.  However, we do not agree with the People's assertion that *Lucero* precludes a juvenile sentenced to anything less than LWOP from raising a constitutional claim under *Graham* or *Miller*.

we perceive no basis for disturbing that discretionary decision. *See Lopez*, 113 P.3d at 720.

¶ 58    Davis further argues that the trial court abused its discretion by not considering his youth in imposing consecutive sentences. Contrary to this contention, the record reveals that the trial court entertained defense counsel's argument concerning Davis's youth and reviewed a written statement from Davis. The trial court stated, "To be sure, what [defense counsel] says has some sense with regard to the youth of the defendant." Thus, we also disagree with Davis's argument on this point and perceive no abuse of discretion on the trial court's part.

### 2. Pre-1991 LWPP-40 Sentencing Scheme

¶ 59    Davis contends that his LWPP-40 sentence is unconstitutional because it was imposed under a sentencing scheme that did not differentiate between adults and juveniles convicted of class 1 felonies. We disagree.

¶ 60    Davis bases this contention on language in *Miller*, in which the Supreme Court stated that a sentencing court must consider "youth and its attendant characteristics" before sentencing a juvenile to LWOP. 567 U.S. at 465. Davis thus urges us to extend the logic of

28

*Miller*, as well as *Graham*, and hold the pre-1991 LWPP-40 sentencing scheme unconstitutional because it did not require — or even permit — sentencing courts to treat juveniles differently from adults.

¶ 61 We conclude that this argument has been at least implicitly (if not explicitly) rejected by the Colorado Supreme Court. In *Tate*, the court concluded that LWPP-40 was a proper sentence for those juveniles unconstitutionally sentenced to mandatory LWOP for offenses committed between July 1, 1990, and June 30, 2006. ¶ 7, 352 P.3d at 963. The court acknowledged that LWPP-40 was the mandatory sentence for juveniles convicted of class 1 felonies before July 1, 1990. *See id.* Davis correctly contends that the constitutionality of the pre-1991 sentencing scheme was not squarely before the *Tate* court. Nevertheless, the supreme court implicitly concluded that the pre-1991 LWPP-40 sentencing scheme was constitutional under *Miller* and rejected the argument that LWPP-40 was unconstitutional because it was mandatory. *Id.* at ¶ 50, 352 P.3d at 970 ("*Miller* does not go so far as to declare LWPP unconstitutional as applied to juveniles . . . ."). Thus, we disagree with Davis's contention that the pre-1991 LWPP-40 sentencing

scheme was unconstitutional because it applied equally to juveniles and adults.

¶ 62    Davis nevertheless contends that, although a juvenile convicted of first degree murder today would be sentenced to LWPP-40, *see* § 18-1.3-401(4)(b)(I), it is constitutionally significant that adults sentenced to first degree murder now receive a harsher sentence of, at a minimum, LWOP, *see* § 18-1.3-401(1)(a)(V)(A.1) (establishing life imprisonment as the minimum sentence for class 1 felony and death as maximum sentence).  According to Davis, *Miller*'s recognition that juveniles are different for sentencing purposes is now included in Colorado's sentencing scheme because the current statutes "take into account the juvenile statu[s] by providing for a lesser penalty."

¶ 63    We perceive no constitutional significance in the current statute's differential treatment of adults.  That adults convicted of class 1 felonies today receive a harsher punishment than similarly convicted juveniles does not affect the constitutionality of Davis's sentence.

¶ 64    Finally, we disagree with Davis's related argument that the imposition of a lengthy mandatory minimum sentence of forty

calendar years prior to his eligibility for parole violates the Eighth Amendment. Again, we conclude this argument is foreclosed by our supreme court's analysis in *Tate*. As noted, the *Tate* court rejected the argument that LWPP-40 was unconstitutional because it was mandatory. ¶ 50, 352 P.3d at 970. The court raised no constitutional concerns about the mandatory forty calendar years imprisonment aspect of the LWPP-40 sentence. Thus, we conclude that the imposition of an LWPP-40 sentence on juveniles is constitutional under *Miller* and precedent from our supreme court.

### 3. Parole as Meaningful and Realistic Opportunity for Release

¶ 65    Davis finally contends that his LWPP-40 sentence is unconstitutional because Colorado's parole system does not provide a meaningful and realistic opportunity for release.[8] We again disagree.

---

[8] As noted above, the People rely solely on *Lucero* to argue that *Graham* and *Miller* do not apply to Davis's sentence of LWPP-40. In *Lucero*, the defendant argued that his aggregate term-of-years sentences totaling eighty-four years amounted to de facto LWOP. *Lucero*, ¶ 14, 394 P.3d at 1132. However, the supreme court's decision did not address whether Colorado's parole system provided a meaningful opportunity for release. Contrary to the People's argument, *Lucero* is not precedent for an issue not raised and not decided. Thus, *Lucero* is not dispositive of Davis's argument that

¶ 66 Davis cites several statutes and cases from other jurisdictions in support of his position. As he asserts, several states have enacted legislation enabling a juvenile sentenced to LWPP to seek judicial review of his or her sentence after a certain number of years. *See, e.g.*, Fla. Stat. § 921.1402 (2017). In other states, courts have held that their parole procedures do not comply with the mandates of *Graham* and *Miller* because the parole system does not provide a meaningful opportunity for release. *See Hayden v. Keller*, 134 F. Supp. 3d 1000, 1011 (E.D.N.C. 2015) (concluding that the "North Carolina parole review process for juvenile offenders serving a life sentence violates the Eighth Amendment"); *Atwell v. State*, 197 So. 3d 1040, 1041 (Fla. 2016) ("We conclude that Florida's existing parole system, as set forth by statute, does not provide for individualized consideration of Atwell's juvenile status at the time of the murder, as required by *Miller*, and that his sentence, which is virtually indistinguishable from a sentence of life without parole, is therefore unconstitutional."); *see*

---

the possibility of parole after forty years does not satisfy the Supreme Court's requirement that he be afforded a meaningful opportunity for release from prison.

*also Hawkins v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 30 N.Y.S.3d 397, 400 (N.Y. App. Div. 2016) ("For those persons convicted of crimes committed as juveniles who, but for a favorable parole determination will be punished by life in prison, the Board must consider youth and its attendant characteristics in relationship to the commission of the crime at issue.") (citations omitted).  *See generally* Beth Caldwell, *Creating Meaningful Opportunities for Release:* Graham*,* Miller *and California's Youth Offender Parole Hearings*, 40 N.Y.U. Rev. L. & Soc. Change 245 (2016) (recommending guidelines for "youth-specific parole hearings").

¶ 67    However, we conclude that Davis has not presented sufficient evidence that Colorado's parole system runs afoul of *Graham* or *Miller*.

¶ 68    Colorado's parole board is statutorily authorized to "consider all applications for parole." § 17-2-201(4)(a), C.R.S. 2017.  In considering offenders for parole, the board "shall consider the totality of the circumstances," including, among several other enumerated considerations, "[a]ggravating or mitigating factors from the criminal case." § 17-22.5-404(4)(a)(VIII), C.R.S. 2017; *see also*

State Bd. of Parole Rule 5.00, 8 Code Colo. Regs. 1511-1 (setting forth procedure for parole applications, interviews, and hearings, and allowing offender to make statement during application interview).

¶ 69    As a general rule, parole board decisions to grant or deny parole are wholly within the board's discretion and not subject to judicial review.  *See People v. Dean*, 2012 COA 106, ¶ 34, 292 P.3d 1066, 1074, *aff'd*, 2016 CO 14, 366 P.3d 593.  However, an inmate can seek judicial review of a parole board decision on the basis of the board's failure "to exercise its statutory duties."  *In re Question Concerning State Judicial Review of Parole Denial*, 199 Colo. 463, 465, 610 P.2d 1340, 1341 (1980).

¶ 70    We conclude that, in the absence of evidence to the contrary, Colorado's parole system provides juveniles sentenced to LWPP-40 a meaningful and realistic opportunity for release based on "demonstrated maturity and rehabilitation."  *Graham*, 560 U.S. at 75.  Based on our review of the factors the parole board must consider when weighing an offender's application, the board is permitted to consider a juvenile's youth at the time of the offense as a mitigating circumstance.  Further, the regulations promulgated by

the parole board allow an offender to present his or her case during an application interview. Finally, although the parole board's decisions are usually immune to judicial review, an offender can seek such review if the board abdicates its statutory duties. Davis does not offer any evidence that the Colorado parole board has failed or will fail to consider his youth when he committed his offenses in considering his eligibility for parole.

¶ 71    In sum, we determine that Davis's LWPP-40 sentence is not rendered unconstitutional by virtue of the parole board's discretion to grant or deny parole in the future.

## VI.  Conclusion

¶ 72    Accordingly, the orders are affirmed.

JUDGE WELLING and JUDGE DAVIDSON concur.