23CA0653 Peo v Ramadon 06-05-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA0653
El Paso County District Court No. 12CR2692
Honorable Marcus S. Henson, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Jasim Mohammed Hassi Ramadon,

Defendant-Appellant.

ORDER AFFIRMED

Division IV
Opinion by JUDGE MEIRINK
Freyre and Gomez, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced June 5, 2025

Philip J. Weiser, Attorney General, Jillian J. Price, Deputy Attorney General, Denver, Colorado, for Plaintiff-Appellee

Lauretta A. Martin Neff, Alternate Defense Counsel, Palisade, Colorado, for Defendant-Appellant

¶ 1     Defendant, Jasim Mohammed Hassi Ramadon, a/k/a Jay Hendrix,[1] appeals the postconviction court's order denying his motion for postconviction relief.  We affirm.

## I.     Background

¶ 2     In 2012, Ramadon and three others were arrested for sexual assault.  Ramadon was charged with multiple counts of sexual assault, unlawful sexual contact, and attempted sexual assault and one count of first degree assault.  He was also charged with thirteen crime of violence sentence enhancers.  At trial, Ramadon's codefendants testified that Ramadon was responsible for the sexual assault.  Ramadon's defense was that he was innocent and was used as a scapegoat by the codefendants, who viewed him as an outcast.  While one count of unlawful sexual contact and its accompanying crime of violence sentence enhancer were dismissed and Ramadon was acquitted of first degree assault and its accompanying sentence enhancers, the jury convicted Ramadon of all remaining charges.  Ramadon was sentenced to a controlling

---

[1] Because defendant refers to himself as "Ramadon" in the opening brief, we do too.

term of twenty-eight years to life in the custody of the Department of Corrections.

¶ 3    On direct appeal, Ramadon claimed instructional and evidentiary error. He also argued that some of his convictions were multiplicitous or otherwise improper. A division of this court disagreed with his claims of evidentiary and instructional error but merged his multiplicitous convictions, vacated the improper ones, and ordered the mittimus be amended to reflect judgments of conviction on only the sexual assault charge and the two attempted sexual assault charges. *People v. Ramadon*, (Colo. App. No. 14CA1047, Dec. 14, 2017) (not published pursuant to C.A.R. 35(e)).

¶ 4    Ramadon subsequently filed a pro se motion for postconviction relief, which counsel later supplemented. The court held an evidentiary hearing to address Ramadon's claims that (1) his waiver of his right to testify was invalid; (2) trial counsel was ineffective for dissuading him from testifying, failing to investigate or call certain potential witnesses, and failing to call a rebuttal DNA expert witness at trial; and (3) all errors individually deemed harmless together amounted to cumulative error. The court made oral

findings and denied Ramadon's postconviction motion. Ramadon appeals.

## II. Standard of Review

¶ 5 "When resolving a motion pursuant to Crim. P. 35(c), a court must make findings of fact and conclusions of law sufficient to explain the basis of its ruling." *People v. Hardin*, 2016 COA 175, ¶ 30. The defendant bears the burden of proving his postconviction claims by a preponderance of the evidence. *People v. Naranjo*, 840 P.2d 319, 325 (Colo. 1992).

¶ 6 We defer to the postconviction court's findings of fact and review conclusions of law de novo. *People v. Stovall*, 2012 COA 7M, ¶ 18. We review de novo whether a waiver of a constitutional right was knowing, voluntary, and intelligent but defer to the postconviction court's findings of fact. *People v. Davis*, 2018 COA 113, ¶ 35; *see also Hardin*, ¶ 39 (deferring to postconviction court's determinations as to the "weight and credibility to give to the testimony of witnesses at a Crim. P. 35(c) hearing").

¶ 7 A postconviction court's finding of fact is clearly erroneous only if it has "no support in the record." *Sanchez-Martinez v. People*, 250 P.3d 1248, 1254 (Colo. 2011). So long as the record

supports the postconviction court's findings of fact, we will not find that the court has committed clear error.

### III.  Ramadon's Claims

¶ 8      Ramadon contends that his trial counsel threatened to abandon representation if he testified at trial, and, therefore, he did not voluntarily, intelligently, and knowingly waive his constitutional right to testify.  Ramadon argues that trial counsel's threat constituted ineffective assistance of counsel, which violated his fundamental constitutional right to testify.  We disagree.  We address Ramadon's assertion that he did not validly waive his right to testify before addressing his ineffective assistance of counsel claims.

### A.  *Curtis* Advisement and Waiver of the Right to Testify

¶ 9      A criminal defendant has a right to testify in his or her own defense under the Due Process Clauses of the United States and Colorado Constitutions.  U.S. Const. amend. XIV; Colo. Const. art. II, § 25.  A defendant's waiver of the right to testify must be "knowing, voluntary, and intelligent, and the trial court must make an on-the-record advisement explaining the nature of this right."

*Moore v. People*, 2014 CO 8, ¶ 11 (citing *People v. Blehm*, 983 P.2d 779, 782 (Colo. 1999)).

¶ 10    The trial court should advise the defendant outside the presence of the jury (1) that he has a right to testify; (2) that nobody can prevent him from testifying if he so chooses; (3) that if he testifies, the prosecution will be allowed to cross-examine him; (4) that if he testifies, the prosecution will be entitled to ask him about and disclose to the jury any previous felonies he has been convicted of; and (5) that if his prior felony convictions are disclosed to the jury, the jury will be instructed to consider the conviction only as it relates to his credibility. *People v. Curtis*, 681 P.2d 504, 514 (Colo. 1984). Additionally, the court should inform the defendant that he has the right to not testify, and if he chooses to not testify, the jury will be instructed about that right. *Id.* The purpose of the advisement is to "safeguard the knowing, voluntary, and intelligent nature of defendant's understanding of the right to testify in deciding whether or not to testify." *Moore*, ¶ 19.

¶ 11    When reviewing a defendant's claim against the waiver of his right to testify, the postconviction court focuses "not only on the sufficiency of the advisement itself, but also on the actual knowing,

voluntary, and intelligent nature of a defendant's waiver." *Id.* at

¶ 17. The "content of a trial court's advisement, standing alone,

does not conclusively establish whether a defendant's waiver of the

right to testify was or was not knowing, voluntary, and intelligent."

*Id.* at ¶ 24. Rather, the inquiry is "whether the defendant waived

this right knowingly, voluntarily, and intelligently." *Id.* When

determining whether a defendant's waiver was valid, the court

should consider the circumstances surrounding the waiver,

including what the defendant's attorney did or did not say; the

defendant's impairment or intoxication; any potential language

barrier; or coercion to a degree that renders the waiver not knowing,

voluntary, and intelligent. *Id.* at ¶ 26.

¶ 12    Finally, trial counsel may advise a defendant against

testifying, but, absent an ethical concern, counsel cannot threaten

to withdraw as the defendant's attorney or to completely contradict

or wholly undermine the defendant's testimony should he choose to

testify. *People v. Bergerud*, 223 P.3d 686, 703 (Colo. 2010).

## 1. Additional Facts

¶ 13   At trial, the court gave Ramadon two *Curtis* advisements.  The first advisement began with the following dialogue between the court and Ramadon:

> The Court: What I'm going to do is give you an advisement of your rights in relation to your choice to testify or not.  I want you to think about this overnight.  This advisement is kind of giving you information about your rights regarding testifying or not.  It's to help you understand not only your right to take the stand, but also the consequences, thereof.  And that you may testify even if your counsel advises against that.  Do you understand that?
>
> [Ramadon]: Yes, ma'am.
>
> The Court: The right to testify exists.  Do you understand that?
>
> [Ramadon]: Yes, ma'am.
>
> The Court: And this right is personal and no one can prevent the defendant, which is you, from testifying.  Sir, do you understand that?
>
> [Ramadon]: Yes, ma'am.

¶ 14   The court advised Ramadon on the remaining elements, asked Ramadon if he understood each element, and continued to clarify that the decision to testify was only his.  The court then reiterated that Ramadon should think about his decision overnight: "What I'm

7

going to do is have you think about that tonight; confer with counsel. I'll ask you about your decision not today. Not today. But after the prosecution is done with their case, correct?"

¶ 15     The next day, the court gave Ramadon a second *Curtis* advisement:

> The Court: The Court talked to you yesterday about your right to testify.
>
> [Ramadon]: Yes, ma'am.
>
> The Court: That right is personal to you, which means it's your decision to testify or not. I'm going to read the proffered instruction; that you, the defendant, is never compelled to testify and the fact that you do not testify[] cannot be used as an inference of guilt, which shall not prejudice you in any []way. Do you understand that?
>
> [Ramadon]: Yes, ma'am.
>
> The Court: No one can prevent you from testifying if you want to testify. Do you understand that?
>
> [Ramadon]: Yes, ma'am.

¶ 16     Again, the court walked Ramadon through each remaining element of the advisement, asked if he understood, and asked if he was under the influence of drugs or alcohol. Ramadon confirmed that he was not under the influence but indicated that he suffered

8

from "brain injuries" that might impair his memory. Nevertheless, he acknowledged the court's advisement, stated that he understood that the right to testify was his decision alone, and waived it as part of the following exchange:

> The Court: Do you think those [injuries] would affect your ability to understand my advisement to you about your right to testify today?
>
> [Ramadon]: I'm not good with the law, but I trust my lawyer.
>
> The Court: All right. But you understand that?
>
> [Ramadon]: Yes.
>
> The Court: Even if you trust your lawyers, th[e] decision to testify or not is solely yours.
>
> [Ramadon]: Yes, I understand.
>
> The Court: Do you need more time to talk to your attorney about that?
>
> [Ramadon]: No, I do not, ma'am.
>
> The Court: What is your decision?
>
> [Ramadon]: At this time, I wish not to testify.
>
> The Court: And nobody's —
>
> [Ramadon]: I talked to my counsel, my lawyers and I don't testify. That is a voluntary decision by me.

The Court: And nobody's forcing you to do that, right?

[Ramadon]: No, ma'am.

The Court: Is that sufficient to the People?

[The People]: That's fine with us, Your Honor.

The Court: Okay. The Court is going to find that [Ramadon] was given the *Curtis* advisement. I find that he has elected not to testify. I find that decision is knowingly, intelligently and voluntarily made. Is there anything further?

[The People]: No, Your Honor.

### 2. Analysis

¶ 17 Ramadon's postconviction claim that his waiver was invalid rests on interactions that occurred with counsel before trial. According to Ramadon, his trial counsel threatened to withdraw if he chose to take the stand. During the postconviction hearing, Ramadon testified that he felt afraid and threatened by his attorneys, but he "kept saying yeah, I understand to everything" during the two *Curtis* advisements.

¶ 18 At the postconviction hearing, both Ramadon's attorneys, Chalmers and Hostetler, were asked if they threatened to abandon representation. Chalmers acknowledged that she strongly

10

encouraged Ramadon not to testify but did not remember

threatening him:

> Q. When you had the conversations with Mr. Ramadon about whether to testify or not testify, was that pretrial?
>
> A. We had conversation[s] pretrial for sure. He was adamant all along he wanted to testify, and we were doing everything we could to prevent him from testifying. Apart from actually threatening or something like that, we were strongly encouraging him not to testify.
>
> Q. And as these issues came up and the evidence that you suspected that the District Attorney would present that was not presented, did you ever have additional conversations with Mr. Ramadon about his right to testify?
>
> A. I don't think so.
>
> Q. Do you believe you should have had additional conversations with Mr. Ramadon about testifying?
>
> A. We absolutely should have and, you know, hindsight is obviously 20-20. [Ramadon] does have — I mean, obviously the judge doesn't know him. We got to know him over the course of our representation. I think the jury might have seen some of what we were talking about why the guys like, kind of didn't like [Ramadon] if we had put him on the stand. He kind of says some things that ha[ve] like an air of cockiness and some other things.

11

Chalmers was also asked about her conversation with Ramadon after the court had given the *Curtis* advisements:

> Q. Now to be clear, you said you never threatened him?
>
> A. No, I don't think that I threatened him. I don't believe I threatened him. That's not generally my practice. I would have said things that he might have interpreted as a threat. You're going to die in prison if you testify, I have said that to clients before.
>
> . . . .
>
> Q. You said that you don't believe you ever said, "I will not represent you, I will leave right now" if he gets on the stand?
>
> A. I don't remember that happening.
>
> Q. Would it be fair to say there are times that you disagree with a client's decision when it comes to whether to testify or not?
>
> A. All the time.
>
> Q. It's their decision?
>
> A. It's their decision.
>
> Q. Do you believe it would be either morally or ethically wrong to abandon a client if they make a decision you disagree with?
>
> A. Yeah.
>
> Q. You wouldn't threaten something that is morally or ethically wrong?

A. I would hope not, no. I don't remember saying that to him. I do remember saying I think you're going to die in prison if you're going to testify.

¶ 19     Similarly, Hostetler testified that while she could see how Ramadon may have interpreted her strong advice not to testify as a threat to abandon representation, that was not her position:

Q. And what was your position?

A. That he was not going to testify.

Q. Did you ever threaten Mr. Ramadon in any way that if he chose to testify that you would terminate your representation of him?

A. I'm sure we never said it like that, but I can remember saying we will not represent you if you testify, we will not. We cannot do this if you testify.

Q. Fair to say that it came out essentially that if he testified, you were saying you would no longer be his attorney; is that correct?

A. I can understand 100% how he would interpret it that way.

. . . .

Q. And what was your purpose of hounding and being adamant that Mr. Ramadon couldn't take the stand?

A. I couldn't see a way to defend the case with him taking the stand. I just thought that it would — I didn't think that the jury was going

13

to have the faith in him and believe in him the way we did.

¶ 20    The postconviction court found that "trial counsel strongly discouraged Mr. Ramadon from testifying" and that, in advance of trial, there was a "not even so veiled suggestion that counsel may actually end their representation of Mr. Ramadon should he make the decision to testify." It also acknowledged Ramadon's testimony that "he feared losing his counsel if he were to make the decision potentially to testify." Ultimately, however, the postconviction court determined that Ramadon validly waived his right to testify after reviewing the trial court record, which was "different from what was otherwise presented in the evidence in [the postconviction] hearing":

> The evidence from trial indicates that Mr. Ramadon was advised — on more than one occasion by the Court, was advised on many different levels regarding the various factors under *Curtis*. He was reminded that it was his decision and his decision alone as to whether or not he wished to testify. And further, the Court finds that in response to these advisements that Mr. Ramadon had expressed an understanding of those rights. And furthermore, had indicated on the record that he trusted his lawyers and that he did not need any additional time to speak further with them before deciding to waive his right to testify.

14

And what's really striking to the Court is that under these circumstances the Court has to give effect, obviously, to the full record that's available to me. I do have to give effect to the *Curtis* advisement and, again, the responses to that inquiry.

. . . .

Under these circumstances, the Court finds that this was — considering both the testimony in our hearing and the responses to the court at the time of trial, that this was a valid waiver of the right to testify. The Court is also taking this approach and really kind of couching this assessment in the context of additional case law, that suggests that even what I would describe as overtly aggressive conduct that's engaged in by counsel at the time of a discussion about the right to testify, is not enough to necessarily change the assessment about whether or not there was still a valid waiver of the right consistent with a *Curtis* advisement being given and all of the factors of *Curtis* being outlined by the Court.

¶ 21    On appeal, Ramadon disagrees with the postconviction court's conclusion that his waiver was valid. He argues that his trial counsel's conduct was so egregious that it violated his right to testify. We are not persuaded.

¶ 22    First, although the postconviction court found that counsel strongly discouraged Ramadon from testifying and perhaps made a "veiled suggestion" that they might end their representation if he

15

chose to testify at trial, the court did not find that they expressly threatened such action. The court also found that counsel made those statements "in advance of" and "not during the course of trial." Counsel's behavior did not amount to the situation the supreme court was concerned about in *Bergerud*, when the defendant was expressly forced to choose between proceeding to trial pro se — which he ultimately chose to do after repeatedly telling the court he had "no other choice" — and proceeding with attorneys whose theory of defense would contradict and undermine his testimony. *Bergerud*, 223 P.3d at 701. Likewise, the postconviction court found that despite any veiled suggestion, Ramadon had not been "coerced to a degree that render[ed] the waiver [of his right to testify] not knowing, voluntary, [or] intelligent." *Moore*, ¶ 26.

¶ 23 Ramadon's counsel did not usurp his ability to make a valid waiver by expressly threatening to withdraw representation. Rather, his trial counsel's behavior is more analogous to defense counsel's behavior in *Davis*, when the court determined that the defendant validly waived his right to testify. *Davis*, ¶ 44. In *Davis*, trial counsel testified at a postconviction evidentiary hearing that he

16

"screamed at clients to try to persuade them not to testify when they've wanted to testify" and that it was "often a question that a defense attorney fe[lt] very strongly about." *Id.* at ¶ 33. Counsel admitted that if he disagreed with clients who wanted to take the stand, he would do his very best to dissuade them but would not "explicitly prohibit" a client from testifying in his or her defense. *Id.* Like counsel in *Davis*, Chalmers and Hostetler were simply doing everything they could within the boundaries of *Bergerud* to prevent Ramadon from testifying because the jury would learn about his criminal history, and they feared that the jury may have found him "cocky," "annoying," or "unlikeable."

¶ 24 Second, Ramadon received two adequate *Curtis* advisements. We recognize that standing alone, the trial court's advisements do not conclusively establish whether Ramadon's right to testify was knowing, voluntary, or intelligent, *see Moore*, ¶ 24, but the advisements, if not contested by evidence showing otherwise, stand in support of the validity of the waiver, *see id.* at ¶ 26. The trial testimony shows that Ramadon repeatedly confirmed that he understood every element of the *Curtis* advisements he was given and that the decision to testify was solely his to waive. Ramadon

17

testified that waiving his right to testify was a "voluntary decision by me," that no one forced him to waive it, and that he "trusted his lawyers."

¶ 25 The record supports the postconviction court's findings of fact on the weight of Ramadon's testimony at the postconviction hearing, his waiver at trial, and his trial attorneys' accounts of their conversations with Ramadon. Accordingly, we cannot find that the court committed clear error.

¶ 26 Additionally, reviewing these findings de novo, we conclude that Ramadon knowingly, voluntarily, and intelligently waived his right to testify at trial.

### B. Ineffective Assistance of Counsel Claims

¶ 27 Next, Ramadon contends that the postconviction court erred by denying his postconviction motion as it relates to his ineffective assistance of counsel claims. Specifically, he argues that trial counsel was ineffective by (1) threatening to withdraw if he chose to testify; (2) failing to investigate and call potential witnesses; and (3) failing to consult with or call a rebuttal DNA expert. We disagree with these assertions in turn and conclude that the postconviction

18

court properly denied Ramadon's motion as it relates to these claims.

### 1. Applicable Law and Standard of Review

¶ 28 To prevail on an ineffective assistance of counsel claim, the defendant must establish that (1) trial counsel's performance was so deficient that it fell below the level of reasonably competent assistance, and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Because a defendant must prove both deficient performance and prejudice, the postconviction court may deny a claim of ineffective assistance of counsel if the record establishes that the defendant has failed to establish either prong. *Id.*

¶ 29 To prove the deficient performance prong, the defendant must "show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. The performance inquiry "must be whether counsel's assistance was reasonable considering all the circumstances," and "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 688-89.

¶ 30 Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on

information supplied by the defendant. *Id.* at 691. Trial counsel is the "captain of the ship" on tactical issues, including what trial strategy should be used in the defense of the case. *Arko v. People,* 183 P.3d 555, 558 (Colo. 2008) (quoting *Steward v. People,* 498 P.2d 933, 934 (Colo. 1972)). Trial strategy includes decisions like "what witnesses to call (excepting the defendant), whether and how to conduct cross-examination, what jurors to accept or strike, and what trial motions to make." *Curtis,* 681 P.2d at 511. A mere disagreement over trial strategy does not establish, or even support, a claim of ineffective assistance of counsel. *People v. Bossert,* 722 P.2d 998, 1010 (Colo. 1986).

¶ 31 An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of conviction if the error had no effect on the judgment. *Strickland,* 466 U.S. at 692. To meet the second *Strickland* prong, it is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. *Id.* at 693. Rather, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

¶ 32    Finally, "[a] conclusion on either *Strickland* prong presents a mixed question of law and fact." *People v. Sifuentes*, 2017 COA 48M, ¶ 16.  While we review a postconviction court's factual findings with deference, we review the application of law to those findings de novo.  *Id.*

### 2.    Ineffective Assistance of Counsel – Waiver of the Right to Testify

¶ 33    As discussed, Ramadon's counsel conceded at the postconviction hearing that they vehemently opposed his desire to testify.  Ramadon argued that this conduct amounted to ineffective assistance of counsel.  The postconviction court disagreed.

¶ 34    While acknowledging that counsel's pretrial behavior was aggressive, the postconviction court found that counsel were not deficient in their performance because they had strategic reasons for urging Ramadon not to testify based on his prior criminal history and how the jury would negatively perceive his "arguably unpleasant" personality.  The court concluded that the first *Strickland* prong was not met because counsel's advice was not something that fell outside the range of professionally competent assistance or that was otherwise unreasonable.

¶ 35    Additionally, though it did not have to address the second *Strickland* prong, the court nevertheless concluded that Ramadon failed to prove that, even if counsel had advised Ramadon differently and he had testified, the outcome of the trial would have been different.

¶ 36    On appeal, Ramadon contends that trial counsel's threats to withdraw representation constituted ineffective assistance of counsel because counsel's behavior impeded his ability to exercise his constitutional right, and the postconviction court applied the wrong legal standard.  We disagree.

¶ 37    With respect to the first *Strickland* prong, the record supports the postconviction court's findings that counsel had several strategic reasons for advising Ramadon not to testify, including Ramadon's criminal history and counsel's worry that the jury would perceive him in an unfavorable manner.  We cannot say the postconviction court erred by concluding that Ramadon failed to prove the first *Strickland* prong.

¶ 38    With respect to prejudice, Ramadon claims the postconviction court applied the wrong legal standard.  According to Ramadon, when ineffective assistance of counsel is at issue and a

constitutional right — like the right to testify — is foregone, the prejudice prong of the *Strickland* test is modified. In these instances, the defendant only has to show that but for counsel's erroneous performance, the defendant would have exercised his right. *People v. Robles*, 74 P.3d 437, 439 (Colo. App. 2003) ("[T]he prejudice prong of the *Strickland* test is modified in cases where counsel's erroneous performance leads to a defendant's deprivation of legal proceedings.").

¶ 39 Ramadon's argument is misplaced. In *Robles*, a division of this court noted that the prejudice prong is modified in cases where the defendant has been deprived of a *legal proceeding. Id.* Ramadon was not deprived of a legal proceeding, so *Robles*'s modified prejudice standard is inapplicable. *See, e.g., Roe v. Flores-Ortega*, 528 U.S. 470 (2000) (defendant claiming ineffective assistance because counsel failed to consult with him about appeal must prove prejudice by showing only that he would have appealed but for counsel's failure to consult with him).

¶ 40 As mentioned, having determined that Ramadon failed to meet the first *Strickland* prong, the postconviction court was not required to consider the prejudice prong. Nevertheless, we agree that the

postconviction court's application of the second *Strickland* prong was correct and that Ramadon failed to prove the outcome of trial would have been different had he testified.

¶ 41 Because Ramadon failed to show that his counsel's performance was deficient and that he was prejudiced by this performance, we agree with the postconviction court's conclusion that Ramadon failed establish ineffective assistance of counsel regarding his waiver of his right to testify.

### 3. Ineffective Assistance of Counsel – Failure to Investigate and Call Witnesses

¶ 42 Ramadon next contends that the postconviction court erred in finding his trial counsel was not ineffective for failing to investigate or call to the stand two witnesses, Mario Raxon and Anthony Swindle. We disagree and address the claim as to each potential witness.

### a. Mario Raxon

¶ 43 Before trial, Ramadon's counsel sent an investigator to interview the first potential witness, Raxon. Raxon attended the same church as Ramadon and was in jail with Ramadon and his codefendants. Raxon claimed that some of the codefendants

24

admitted that Ramadon was not the main offender, but they had conspired to lie and blame Ramadon for the assault to escape consequences. During trial, Ramadon's counsel told the court they discussed the possibility of calling Raxon to testify but ultimately decided against it.

¶ 44 Ramadon's trial counsel sent their investigator to interview Raxon about the purported confession by one of Ramadon's codefendants. At trial, Chalmers told the court, "Ms. Hostetler and I talked about Mr. Raxen [sic] this weekend. At this point we don't anticipate calling him. However, defense strategy is variable and certainly things could change in the next two-and-a-half days." This record suggests that Ramadon's trial counsel took steps to investigate Raxon and considered the benefit of his testimony before deciding whether they should call him at trial.

¶ 45 In its oral findings on the postconviction motion, the court concluded that trial counsel's decision to investigate Raxon, as well as the ultimate decision to not call him at trial, was a strategic choice that did not amount to deficient performance.

¶ 46 Because the record shows that Ramadon's counsel took active steps to investigate and consider Raxon as a potential witness, the

25

court did not err in concluding that Ramadon failed to prove counsel's performance was deficient.

### b. Anthony Swindle

¶ 47 Before trial, Ramadon informed his attorneys of a second potential witness who claimed to have been cellmates with one of Ramadon's codefendants. This second potential witness, Swindle, told Ramadon that his cellmate confessed that everyone was going to blame Ramadon for the assault. When Ramadon first mentioned Swindle to his counsel, Ramadon did not know Swindle's name. Swindle's name would not be discovered until Swindle sent a letter to the public defender's office three years after Ramadon's trial.

¶ 48 At the postconviction hearing, Chalmers recalled that Ramadon told her about another inmate who said one of Ramadon's codefendants confessed that the assault played out exactly how Ramadon claimed it did. But Chalmers also testified that Ramadon did not give her the inmate's name.

¶ 49 Likewise, Hostetler did not remember Swindle's name, nor did she remember Ramadon telling her about an inmate who heard that one of his codefendants had confessed.

¶ 50 Given that trial counsel had little to no information on Swindle's identity, the postconviction court found counsel's decision not to spend time and resources looking for and possibly investigating Swindle was a reasonable one.

¶ 51 As with the decision to not call Raxon, the record supports the postconviction court's conclusion that Ramadon failed to establish the first prong of *Strickland* regarding counsel's alleged failure to investigate Swindle.

### 4. Ineffective Assistance of Counsel – Failure to Effectively Cross Examine DNA Expert

¶ 52 Next, Ramadon contends that his trial counsel was ineffective for failing to call a rebuttal DNA expert and that the postconviction court erred in finding otherwise. Again, we disagree.

¶ 53 Before trial, Ramadon's counsel moved to limit the prosecution's DNA expert's testimony and preclude the expert from testifying that the analysis excluded the other suspects. Counsel also took steps to familiarize herself with DNA terminology, interviewed the prosecution's DNA expert witness, and consulted with more experienced colleagues on DNA testimony.

¶ 54 The postconviction court's findings acknowledged trial counsel's efforts to limit the admissibility of DNA evidence, familiarize themselves with the subject by interviewing the prosecution's expert, and cross-examine the expert at trial "as it relate[d] to the limitations of the DNA evidence and the appropriate conclusions that might be drawn therefrom." Applying these findings, the court concluded that trial counsel's approach was reasonable and did not amount to deficient performance under the first prong of *Strickland.*

¶ 55 To the extent that Ramadon disagreed with how much time and effort trial counsel spent on DNA evidence, this is insufficient to conclude counsel acted unreasonably or performed deficiently. *See Bossert*, 722 P.2d at 1010. Here, the DNA evidence was not the crux of his defense; rather, Ramadon's theory of the case was that his codefendants conspired to blame him for the sex assault.

¶ 56 Because the record supports a finding that Ramadon's counsel did not perform deficiently by not calling a DNA expert, we conclude that the postconviction court did not err in concluding that Ramadon's claim failed.

## C.    Cumulative Error Claim

¶ 57    Because Ramadon is unable prove any error, let alone multiple errors, in the court's denial of his postconviction claim, his cumulative error claim also fails.

¶ 58    Like claims of constitutional violations such as ineffective assistance of counsel and invalid waivers of rights, we review cumulative error claims de novo.  *Howard-Walker v. People*, 2019 CO 69, ¶ 22.  When one error may alone not prejudice a defendant, "the cumulative effect of [multiple] errors and defects" may affect the integrity of the defendant's trial.  *Id.* at ¶ 24 (quoting *People v. Lucero*, 615 P.2d 660, 666 (Colo. 1980)).  To succeed on a cumulative error claim, the court must conclude that multiple errors have been committed; mere allegations of error are insufficient.  *People v. Thomas*, 2014 COA 64, ¶ 61.

¶ 59    As the postconviction court correctly found, Ramadon was unable to prove that his waiver of the right to testify was invalid or that his counsel was ineffective by advising him not to testify, deciding to not call two potential witnesses, or deciding to not retain a rebuttal DNA expert to testify.  Accordingly, his cumulative error claim also fails.

## IV. Disposition

¶ 60　The postconviction court's order is affirmed.

JUDGE FREYRE and JUDGE GOMEZ concur.