22CA1713 Peo v Maher 08-07-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA1713
Arapahoe County District Court No. 12CR2354
Honorable Ryan J. Stewart, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Christopher John Maher,

Defendant-Appellant.

ORDER AFFIRMED

Division II
Opinion by JUDGE BERNARD*
Fox and Harris, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced August 7, 2025

Philip J. Weiser, Attorney General, Jaycey DeHoyos, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Polansky Law Firm, PLLC, Lisa A. Polansky, Boulder, Colorado, for
Defendant-Appellant, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1 Defendant, Christopher John Maher, appeals the postconviction court's order denying his Crim. P. 35(c) motion. We affirm.

## I. Background

### A. The Crime, the Trial, and the Conviction

¶ 2 Defendant dated a woman, K.C., who was the mother of the eleven-year-old victim in this case. Defendant and K.C.'s relationship lasted from August 2006 until June 2012. During that time, K.C. and the victim frequently visited defendant's home. Defendant's daughters, who were sixteen years old and thirteen years old, were often there.

¶ 3 During these visits, the victim claimed defendant repeatedly put one of his fingers in her vagina or in her anus. He rubbed his genitals against her at least once between 2007 and 2012. Most of the incidents happened at defendant's home, and at least one of them occurred in a swimming pool.

¶ 4 In October 2012, four months after K.C. and defendant broke up, the victim told her mother about the sexual abuse. K.C. immediately called the police.

¶ 5    In November 2012, working with the police, K.C. invited defendant to a local restaurant.  She wore a wire.

¶ 6    The meal lasted about four hours, and defendant and K.C. each drank two or three beers.  K.C. told defendant that the victim had claimed he had sexually assaulted her.

¶ 7    Defendant admitted he had sexual thoughts about the victim, although he added she had behaved provocatively toward him.  He felt "a lot of guilt" about being sexually aroused by her.  He said he had "done things . . . that [he] shouldn't have," and those things were "wrong."  He thought he should "get help."  "[A]s far as inappropriate action [was] concerned, it was like momentary, surprise kind of like, in a way, I don't want to say it was an accident necessarily . . . ."  He added, "Did I think about her inappropriately?  Yeah.  Did I stop situations when I should have stopped them?  No."  He did not admit to putting his fingers in the victim's vagina or anus, but he said, "I think I did something."

¶ 8    He referred to three specific incidents involving the victim that had occurred on the same weekend: one in a swimming pool, which was "pretty bad"; one in a truck; and one in a store.  He thought he

"drank a lot" that weekend, and he "didn't really have his head on straight."

¶ 9    The police arrested defendant a short time later. The prosecutor's office charged him with seven counts of sexual assault on a child resulting in a pattern of abuse of the victim. The prosecution later dismissed four of those counts.

¶ 10    In July 2014, a jury convicted defendant of the remaining three counts. His theory of defense at trial was that the events could not have unspooled the way the victim described them because too many people were always around, and none of them saw anything untoward happen between defendant and the victim.

### B.    Direct Appeal and Crim. P. 35(c) Hearing

¶ 11    Maher appealed his convictions. A division of this court affirmed. *See People v. Maher*, (Colo App. No. 14CA2221, Apr. 20, 2017)(not published pursuant to C.A.R. 35(e)).

¶ 12    In 2020, defendant filed a Crim. P. 35(c) motion. As is relevant to our analysis, it raised two groups of claims.

¶ 13    In the first group, defendant asserted that, at the time of his 2014 trial, he was a hard core, functional alcoholic who needed to drink during the trial to avoid showing withdrawal symptoms. He

3

claimed he was incompetent to stand trial, he was incompetent to waive his right to testify, and he would have accepted a plea disposition offered by the prosecution if he had been sober.

¶ 14 In the second group, he submitted that his trial counsel had been ineffective because counsel did not (1) notice the symptoms of his excessive drinking and, therefore, counsel did not raise the issue that he was incompetent to stand trial; (2) call his daughters to testify during the trial about their observations during the period when the victim said defendant had abused her; and (3) challenge the testimony of the prosecution's expert who had physically examined the victim via cross-examination and by calling a defense expert.

¶ 15 In May 2022, the postconviction court held a four-day evidentiary hearing that primarily focused on defendant's drinking before and during the trial. In August 2022, the court issued an order denying defendant's Crim. P. 35(c) motion.

## II. Competency Claims

¶ 16 The postconviction court determined that defendant had not shown he was incompetent to stand trial, or that he was incompetent or too drunk to consider and reject plea dispositions

4

the prosecution had offered or to validly waive his right to testify. He submits the court's factual findings concerning these issues were not supported by the record. As a result, he continues, the court's determination that he did not satisfy his burden to show he was incompetent during these proceedings was flawed. These errors, he finishes up, denied him his right to due process of law. We disagree.

A. Standard of Review and Applicable Law

¶ 17    When we review a postconviction court's decision to deny a Crim. P. 35(c) motion after holding a hearing, we review the court's legal conclusions de novo, but we defer to the court's factual findings if the evidence supports them. *People v. Villanueva*, 2016 COA 70, ¶ 28.

¶ 18    We review de novo whether a defendant's waiver of a constitutional right was knowing and voluntary, but we defer to the trial court's findings of fact. *People v. Davis*, 2018 COA 113, ¶ 35.

¶ 19    In a Crim. P. 35(c) proceeding, a court presumes the validity of a defendant's conviction. *People v. Naranjo*, 840 P.2d 319, 325 (Colo. 1992). "[T]he burden is upon the defendant, as the moving

party, to establish his claim by a preponderance of the evidence." *Id.*

¶ 20　"The weight and credibility to be given the testimony of witnesses in a Crim. P. 35(c) hearing is within the province of the [postconviction] court and when there is sufficient evidence in the record to support the court's findings, its ruling will not be disturbed on review." *People v. Williams*, 908 P.2d 1157, 1161 (Colo. App. 1995).　It is the postconviction court's job "to resolve conflicts, inconsistencies, and disputes in the evidence." *People v. Poe*, 2012 COA 166, ¶ 14.

¶ 21　We review a postconviction court's competency determination for an abuse of discretion. *People v. Rodriguez*, 2022 COA 98, ¶ 12. A court abuses its discretion if its decision is "manifestly arbitrary, unreasonable, or unfair, or it applies an incorrect legal standard." *Id.*

¶ 22　The United Sates and Colorado Constitutions preclude trying mentally incompetent defendants. *People v. Zapotocky*, 869 P.2d 1234, 1237 (Colo. 1994)(citing *Drope v. Missouri*, 420 U.S. 162, 172 (1975)).　In Colorado, defendants are considered "incompetent to proceed" if they suffer from a mental disability that renders them

6

unable to have "sufficient present ability to consult with the defendant's lawyer with a reasonable degree of rational understanding," or, if, because of a mental disability, they do not have a "rational and factual understanding of the criminal proceedings." § 16-8.5-101(12), C.R.S. 2024.

¶ 23    Mental disability is defined by statute as a substantial disorder "of thought, mood, perception, or cognitive ability that results in marked functional disability, significantly interfering with adaptive behavior." § 16-8.5-101(15).  But this statute excludes from the definition of mental disability "acute intoxication from alcohol or other substances . . . [and] any substance abuse impairment resulting from recent use or withdrawal," unless the substance abuse "results in a long-term, substantial disorder of thought, mood, or cognitive ability."  *Id.*

¶ 24    The law presumes defendants are competent.  *People v. Karpierz*, 165 P.3d 753, 758 (Colo. App. 2006).  The burden therefore rests on them to prove they are incompetent.  *Id.*

¶ 25    Defendants have a constitutional right to testify under the United States and Colorado Constitutions.  U.S. Const. amend. VI; Colo. Const. art. II, § 25.  For a waiver of the right to testify to be

valid, the trial court must advise the defendant of that right and ensure that the defendant's waiver is knowing, voluntary, and intelligent. *People v. Curtis*, 681 P.2d 504, 515 (Colo. 1984), *holding modified by People v. Blehm*, 983 P.2d 779 (Colo. 1999). "In order for a defendant to make a voluntary, knowing, and intelligent decision, he must be aware of his right to testify, the consequences of testifying, and his right to take the stand regardless of his counsel's advice to the contrary." *Roelker v. People*, 804 P.2d 1336, 1338 (Colo. 1991).

### B. Postconviction Hearing Testimony and the Postconviction Court's Factual Findings

¶ 26 After listening to the testimony at the four-day hearing, the postconviction court made extensive factual findings, which we summarize next.

### 1. Trial Attorneys

¶ 27 Two pairs of attorneys represented defendant from the time of the filing of charges through the end of the trial. Defendant never confessed to any of his attorneys that he had sexually abused the victim.

8

## a.  Attorneys Bresee and Albani

¶ 28    The first attorney defendant hired was Collin Bresee, who was shortly joined by Peter Albani.

¶ 29    At the beginning of their representation, defendant seemed very involved in his case and focused on its details.  Bresee thought that defendant was a "great client," a "smart guy" who was "very attentive."  At the beginning of the case, defendant expressed an interest in a plea disposition.

¶ 30    Bresee thought defendant would be convicted if the case went to trial because of the statements defendant made to K.C. while she was wearing a wire at the restaurant.  So, when the prosecutor offered defendant a plea disposition, Bresee thought defendant should at least consider it.

¶ 31    The plea disposition's conditions included undergoing intensive probation supervision, spending up to two years in jail, registering as a sex offender, and completing a sex offense-specific evaluation.  Defendant told Bresee he did not want to go to jail, register as a sex offender, or make the statements necessary to complete the evaluation.

¶ 32 Defendant's seeming denial of the evidence and the potential consequences of losing at trial did not strike Bresee as odd. In "the majority of [Bresee's] experience, people either start off . . . in full denial or moderate denial." But defendant's state of denial did not make Bresee "concerned [about defendant's] competency" because defendant never told him that he abused the victim.

¶ 33 As is pertinent to our analysis, three things happened while Bresee and Albani were representing defendant.

¶ 34 First, defendant changed as the case progressed. His girlfriend began to dominate his meetings with the attorneys. Bresee also noticed he seemed to gain a lot of weight, perhaps because he often went out to dinner with his girlfriend. Albani did not attribute his weight gain to abusing alcohol because he had other clients put on a lot of weight during the pendency of their criminal cases due to stress.

¶ 35 Second, the prosecution notified Bresee that defendant violated a condition of his bond by drinking, but the prosecutor elected not to ask the court to revoke his bail. Bresee discussed this report with defendant, who denied he had been drinking.

¶ 36    Third, defendant decided to waive his right to a preliminary hearing. He did not appear in court at the time scheduled for the preliminary hearing. When one of his attorneys contacted him to find out why he missed the court appearance, he replied that he thought he did not have to come if he waived the preliminary hearing. Bresee did not think that any sort of cognitive impairment caused defendant to miss the hearing.

¶ 37    Neither Bresee nor Albani noticed defendant drinking excessively, nor did they think he was an alcoholic.

¶ 38    Bresee and Albani represented defendant for about eight months until they withdrew, citing "an irreconcilable difference." According to Bresee, this difference had come about because defendant was unwilling to meet with his attorneys to discuss the statements he had made to K.C. in the restaurant. (Bresee thought it was important to discuss these statements with defendant before he decided to turn down the prosecution's proposed plea disposition.)

                    b.    Attorneys Silver and Frerich

¶ 39    Defendant then hired Neil Silver and Amy Frerich to represent him. Silver, in turn, hired an investigator.

¶ 40    In the run up to the trial, the prosecution offered a second plea disposition. Silver explained it to defendant, who rejected it, saying that he would not admit the allegations against him. Silver thought he understood the offer.

¶ 41    Neither Silver nor Frerich ever thought defendant was intoxicated when they were around him, and they never received any reports he had been drinking.

¶ 42    Silver only noticed defendant had been drinking on one occasion, which was when he and the investigator dropped by defendant's home. According to the investigator, Silver asked defendant whether he had been drinking. When he answered he had been drinking, Silver told him not to appear like that in front of the jury and to cut down on his drinking. Silver did not remember this conversation.

¶ 43    Frerich sat next to defendant during the trial. She never thought he had been drinking or was intoxicated. For example, she did not smell the odor of an alcoholic beverage and defendant did not slur his words.

¶ 44    Defendant spoke with his attorneys repeatedly throughout the trial. They thought he was intelligent and engaged during these

conversations, and they never formed the opinion he was intoxicated. According to the investigator, Silver thought defendant's poor hygiene, sloppy grooming, and red face would not look good in front of the jury.

### 2. Evidence of Defendant's Drinking

¶ 45 After hearing all the testimony, the postconviction court found that defendant "suffered from alcohol dependency" while this case was pending. As the trial approached, the amount of alcohol he ingested increased, and it led him to put on "a significant amount of weight."

¶ 46 The trial court incarcerated defendant after the jury convicted him. A sheriff's deputy gave him a portable breath test. Its result was .159, which surprised the deputy because the deputy did not think defendant appeared to be intoxicated.

¶ 47 Defendant told the deputy he had been drinking the night before; he said that he drank all the time. He suffered from alcohol withdrawal at the jail, and he was given medication to alleviate his symptoms.

¶ 48 At his presentence investigation, defendant said he did not have an alcohol problem.

¶ 49    Defendant's ex-wife told the postconviction court his drinking increased after his arrest. She described one incident in which she thought he was intoxicated when he met her at a bank to have some documents notarized. But she added he was a "functioning alcoholic," and she thought he understood the documents he signed. She never told any of defendant's trial attorneys she had "any concerns about his alcohol abuse."

¶ 50    Defendant's girlfriend believed alcohol impaired defendant's ability to understand what happened during the trial. He drank before and after each day's proceedings. She drove him to the courthouse during the trial, and he would often instruct her to stop at a liquor store. He was sweaty, and he would start shaking if he went too long without a drink. She also thought he was confused when he met with Silver and Frerich to talk about whether he should testify. She said she told Silver and Frerich she had concerns about his drinking; they testified this did not happen.

¶ 51    No other witnesses who testified at the postconviction hearing thought defendant smelled of alcohol or seemed intoxicated during the trial. No one — not his four attorneys and not the trial court — suggested he was incompetent to stand trial.

¶ 52    Defendant testified at the Crim. P. 35(c) hearing.  He said he

started drinking more after his arrest to the point he became

physically dependent.  He would drink to stop tremors he

experienced and to keep from experiencing violent withdrawal

symptoms.  He felt he had no choice but to drink: he "required it"

"in order to operate."

¶ 53    As the trial progressed, defendant woke up with withdrawal

symptoms more frequently.  He drank to stem his shaking,

difficulties in his breathing, the feeling of fluid in his lungs, and

nausea.  He could not think clearly, either when sober or when

drunk, and he could not get dressed for court without his

girlfriend's help.  Because of his physical condition, he "doubt[ed]"

he would have been able to testify.

¶ 54    Defendant offered the testimony of a forensic psychiatrist, Dr.

Karen Fukutaki, at the hearing.  In 2020, she evaluated whether

defendant was competent at his 2014 trial.  *See People v. Pendleton*,

2015 COA 154, ¶ 11 ("Although retrospective competency

determinations are not favored, they are permitted whenever the

record, together with any additional evidence available, allows the

court to make an accurate assessment of the defendant's competency.").

¶ 55 Dr. Fukutaki decided there was "substantial evidence that [defendant] was not competent" during his 2014 trial because he suffered from a severe alcohol use disorder. Although she required additional information to reach a more definitive opinion, she also "strongly suspected" he was suffering from a neurocognitive impairment because he had memory lapses.

¶ 56 To reach her opinion, she spoke with defendant. She said he displayed "comprehension difficulties . . . years after he had stopped drinking." These difficulties required her to ask her questions with specificity because, otherwise, "he wasn't able to comprehend what I was actually asking." She thought his "ability to cognitively process information verbally provided to him" would have been "compromised" during the trial.

¶ 57 Dr. Fukutaki also interviewed defendant's ex-wife and his girlfriend, looked at historical records, and reviewed transcripts of the trial. She did not speak with defendant's four trial attorneys.

¶ 58    The postconviction court decided that, for several reasons, Dr. Fukutaki's opinion was insufficient to show defendant suffered from a mental disability during his trial.

¶ 59    First, the court observed that Dr. Fukutaki based her report on limited information: she did not interview any of defendant's former attorneys.

¶ 60    Second, Dr. Fukutaki's opinion partially rested on an exchange in a trial transcript between the trial court and defendant when he was deciding whether he would testify.  At one point, when asked whether he understood the court's advisement of rights, he said, "I'm sorry, I missed that."  Dr. Fukutaki thought this showed he did not understand the advisement.  Incorporating nearby lines of the transcript, the court thought defendant had been talking with his attorney and had missed the court's question.  And, during this advisement, the trial court said defendant had been "very attentive" throughout it.

¶ 61    Third, the court discounted the persuasiveness of Dr. Fukutaki's statement that she "strongly suspected" defendant was suffering from a neurocognitive impairment because she admitted

she would need more information to reach a more definitive diagnosis.

¶ 62    Fourth, the court thought Dr. Fukutaki ignored parts of the trial transcript that were inconsistent with her medical opinion, she seemed to be unwilling to answer at least one of the prosecutor's questions, and she resisted admitting to "deficiencies" in her opinion. The court felt these things undermined her credibility and showed she was biased to render testimony favorable to defendant.

¶ 63    The court also decided that, even if it found Dr. Fukutaki's testimony credible, it would still reject defendant's incompetency claim because the record only showed that he was voluntarily intoxicated during the trial, not that he was incompetent.

## C.    The Postconviction Court's Order

¶ 64    The postconviction court held defendant was required to show, under section 16-8.5-101(15), that his alcohol abuse qualified as a mental impairment because it resulted in a "long-term substantial disorder of thought, mood, or cognitive ability." After that, he would have to establish, under section 16-8.5-101(12), that (1) he did not have a "sufficient" ability to consult with his attorneys "with a reasonable degree of rational understanding in order to assist the

defense," or (2) he did not have "a rational and factual understanding of the criminal proceedings."

¶ 65 The court determined defendant had not shown he suffered from a mental impairment. It added that "the only credible evidence suggest[ed]" defendant was "either voluntarily intoxicated during portions of the trial or drinking to avoid symptoms of withdrawal." As a result, he was not incompetent to proceed under section 16-8.5-101(12) because he had not shown his alcohol use resulted in a "long-term, substantial disorder of thought, mood or cognitive ability." § 16-8.5-101(12), (15).

¶ 66 The postconviction court turned to defendant's assertion that he did not knowingly, intelligently, and voluntarily waive his right to testify because he was incompetent. In deciding defendant had not offered sufficient evidence to establish this claim, the court pointed to several things.

¶ 67 The trial court spoke directly to defendant during the advisement. Defendant's responses were contextually appropriate. He appeared to know where he was and what he was doing. At one point, he asked for more time to consult with his attorneys, and the court recessed the proceedings so he could do so. When the trial

court recalled the case, defendant said he had decided not to testify. He said the decision was his, but he had relied on his attorneys' advice in making it.

¶ 68 Based on these things, the postconviction court decided defendant was "perceiving accurately, interpreting and/or responding to the world around him."

¶ 69 The postconviction court then determined the trial court's ruling that defendant had knowingly, intelligently, and voluntarily waived his right to testify was supported by the record. Defendant knew he had the right to testify or not to testify, he understood the consequences of either decision, he was aware the decision was his, and he knew he could decide to testify even if his attorneys advised against it.

### D. Analysis

#### 1. Competency to Stand Trial

¶ 70 Defendant contends it was manifestly unreasonable for the postconviction court to dismiss Dr. Fukutaki's testimony, focusing only on some portions of her testimony instead of looking at it "holistically." But it was up to the court to weigh her credibility and

to determine the weight of her testimony. *Williams*, 908 P.2d at 1161.

¶ 71 There was a conflict, a dispute, between Dr. Fukutaki's testimony and the testimony of the four attorneys. *See Poe,* ¶ 14. Just like the postconviction court was not required to accept the testimony of the four attorneys, it was not obligated to reject it and only accept Dr. Fukutaki's testimony. *See Kim v. Grover C. Coors Tr.,* 179 P.3d 86, 97 (Colo. App. 2007)("[T]he trier of fact may reject unpersuasive expert testimony, even if uncontroverted.").

¶ 72 The record shows the postconviction court had reason to be concerned that Dr. Fukutaki had not spoken with the four attorneys. If she had, she would have learned they thought defendant had rational conversations with them, he seemed to understand what was happening in court, and he did not appear intoxicated.

¶ 73 Perhaps this information would have changed Dr. Fukutaki's mind; perhaps not. But the record supports the postconviction court's concern that not interviewing the attorneys was a significant omission, particularly because they had first-person information about defendant's appearance and behavior during the critical

period leading up to and including his trial. During that time, the attorneys spent a lot of time with defendant; indeed, they were often seated or standing right next to him. Silver and Frerich had repeated conversations with him about his trial. And the trial court, which observed him throughout the trial, did not raise concerns about his competency.

¶ 74 The attorneys and the trial court had the benefit of closely interacting with defendant at the time of the trial, while Dr. Fukutaki was brought into the case about six years after the trial. *See Williams v. Woodford*, 384 F.3d 567, 608 (9th Cir. 2004)("[W]e disfavor retrospective determinations of incompetence, and give considerable weight to the lack of contemporaneous evidence of a petitioner's incompetence to stand trial.").

¶ 75 It is true that defendant's ex-wife and girlfriend testified about defendant's drinking during and around the time of the trial. But the postconviction court did not reject their testimony. Recall the court found defendant had been drinking during the trial to the point he "suffered from alcohol dependency." The court decided defendant had not shown, under section 16-8.5-101(12) and (15), that he suffered from a mental impairment denying him either (1) a

sufficient ability to consult with his attorneys with a reasonable degree of rational understanding to assist them in his defense, or (2) a rational and factual understanding of the proceedings in his case.

¶ 76    While defendant presented evidence at the postconviction hearing indicating he was incompetent during his trial, there was also evidence he was competent.  We conclude that the latter evidence supports the postconviction court's written decision.  Contrary to defendant's implication, we cannot reweigh the evidence, make our own credibility findings, or substitute our judgment for the postconviction court's.  *People v. Sharp*, 104 P.3d 252, 256 (Colo. App. 2004).  We therefore conclude that the postconviction court's decision was not an abuse of discretion because it was not manifestly arbitrary, unreasonable, or unfair and that the court did not apply an incorrect legal standard.  *See Rodriguez*, ¶ 12.

¶ 77    For similar reasons, we also reject defendant's claim that he was not rational enough to decide whether to accept the prosecution's proposed plea dispositions.  Defendant claimed during the postconviction hearing he would have accepted a plea

disposition had he been competent.  But the record also contains

evidence that he told Bresee he would not accept a plea disposition,

and he would not admit he molested the victim.

¶ 78    Silver testified he communicated the plea offer to defendant,

defendant understood it, and defendant was aware of the

consequences of going to trial.  Relying on our previous conclusion

that the record supports the postconviction court's determination

that defendant had not shown he was incompetent, we conclude

that the record also supports the court's determination that he

understood the proposed plea dispositions and knowingly rejected

them.  As a result, that determination was not an abuse of

discretion.  *See id.*

## 2.    Waiver of the Right to Testify

¶ 79    Defendant contends the postconviction court's determination

that he voluntarily waived his right to testify was not supported by

sufficient evidence in the record.  We disagree.

¶ 80    Defendant asserts his intoxication, or his putative mental

impairment rendered him incapable of waiving his right to testify.

In support of this assertion, he points to the testimony from the

Crim. P. 35(c) hearing, in which he said (1) he was convulsing and

"could barely stand up" when the trial court gave him the *Curtis* advisement, and (2) he was confused during the meetings with Silver and Frerich.

¶ 81 We conclude the record supports the postconviction court's determination that defendant's waiver of his right to testify was voluntary. No one corroborated his claim he was convulsing during the advisement, including Silver and Frerich, who were standing close to him. Indeed, they did not think he was intoxicated, he had trouble understanding the advisement, or he was confused. The trial court made no mention of anything suggesting convulsions, and the transcript of the advisement shows defendant responded appropriately to the court's questions.

### III. Ineffective Assistance of Counsel Claims

¶ 82 Defendant contends the postconviction court erred when it denied his claims that Silver and Frerich were ineffective. We disagree.

### A. Standard of Review and Applicable Law

¶ 83 To prevail on an ineffective assistance of counsel claim, a defendant must prove that counsel's performance was deficient and that the deficient performance prejudiced the defendant. *Strickland*

*v. Washington*, 466 U.S. 668, 687 (1984).  To establish trial counsel's deficient performance, the defendant must prove that counsel's conduct fell outside the wide range of professionally competent representation.  *Id.* at 690; *People v. Sherman*, 172 P.3d 911, 913 (Colo. App. 2006).  To establish prejudice, the defendant must show there is a reasonable probability that, "but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Ardolino v. People*, 69 P.3d 73, 76 (Colo. 2003).  "In this context, a reasonable probability means a probability sufficient to undermine confidence in the outcome."  *Id.*  A claim must be denied if a defendant does not prove *either* deficient performance or prejudice.  *People v. Chipman*, 2015 COA 142, ¶ 32.

## B.    Analysis

### 1.    Raising Competency

¶ 84    Defendant asserts Silver and Frerich were ineffective because they did not "investigate or raise competency" and they did not "ensure" defendant "understood the legal proceedings."  We concluded above that the record supports the postconviction court's determination that defendant had not shown he was incompetent during his trial.  And Silver and Frerich testified they had no reason

26

to question defendant's competency. So we further conclude the record supports the postconviction court's determination that Silver and Frerich "would not have been expected to raise [defendant's] competency." Indeed, even defendant's expert witness on criminal defense admitted he would only have conducted an inquiry into the extent of a client's alcohol abuse if he had concerns about the client's competency.

### 2. Calling Defendant's Daughters to Testify at Trial

¶ 85 Defendant's daughters testified at the Crim. P. 35(c) hearing.

¶ 86 Defendant contends that Silver and Frerich were ineffective because they did not call his daughters to testify on his behalf. They would have provided exculpatory testimony, he continues, because they would have told the jury the victim was physically affectionate with defendant, often leading him to tell her to get off him. They added they never saw defendant touch the victim in an inappropriate way. They also would have contradicted the victim's testimony that the daughters had once walked into the kitchen when defendant was pressing himself against her.

¶ 87 Silver and Frerich decided against calling defendant's daughters to testify at trial because they feared alienating or boring

the jury. The postconviction court determined that, although some defense counsel might have called the daughters to the stand, Silver and Frerich's decision not to do so was "a strategic one within the wide range of reasonable representation."

¶ 88 K.C. and the victim's brother testified at the trial that no one saw defendant sexually abuse the victim, so Silver and Frerich thought that the daughters' testimony would have been cumulative, and, according to Frerich, perhaps traumatic for them as they would be testifying in their father's trial.

¶ 89 Their testimony would also have corroborated some of the victim's testimony. They would have admitted that the victim occasionally sat on defendant's lap, including twice in the swimming pool.

¶ 90 Defendant claims that Silver and Frerich's investigation into what defendant's daughters would have to say was not meaningful. Assuming, without deciding, this was the case, defendant did not establish, but for this putative unprofessional error, there was a reasonable probability their testimony would have been sufficient to undermine confidence in the jury's verdict. *See Ardolino,* 69 P.3d at 76. Their testimony did not address or undermine the

prosecution's most compelling evidence corroborating the victim's testimony: defendant's recorded statements to K.C. at the restaurant.

### 3. The Victim's Lack of Injury or Pain

¶ 91 A doctor examined the victim shortly after she reported the abuse. The doctor did not find any evidence of injury to the victim's genitals. Defendant asserts this medical finding was inconsistent with the victim's claim that defendant had penetrated her vagina with his finger. He submits that Silver and Frerich were ineffective because they should have presented evidence, through cross-examination of the prosecution's expert and via the testimony of a defense expert, explaining that repeated vaginal and anal abuse, such as the victim described, would have caused discernible damage, thus undercutting the victim's credibility.

¶ 92 For example, a prosecution expert testified at trial on direct examination that touching a prepubescent girl's hymen would have been painful, akin to feeling like being touched by a knife. Silver only asked three questions of this expert, which were aimed at demonstrating that an examination showing no injury was consistent with no sexual abuse having occurred.

¶ 93    The postconviction court determined that Silver's limited cross-examination was appropriately strategic because it emphasized the prospect that defendant did not abuse the victim. Silver was also able to argue to the jury, based on the expert's direct examination, that any touching of the victim's hymen would have hurt: "Did she ever make a sound or express hurt or fear with other people around?  No.  Never did."

¶ 94    Defendant submits Silver and Frerich should have retained a defense expert to testify about how repeated digital penetration would be expected to cause visible injuries.  But the prosecution theorized at trial that the victim had been mistaken when she said defendant had digitally penetrated her vagina.  Rather, the prosecution argued, defendant merely penetrated her labia without penetrating her vagina.  Consistent with the prosecution's trial theory, the expert whom defendant called to testify at the Crim. P. 35(c) hearing said she would not expect to see injuries if there was only penetration of a girl's labia.

¶ 95    We conclude the record supports the postconviction court's determination that defendant was not prejudiced because Silver and Frerich did not call a defense expert or because Silver only

30

engaged in limited cross-examination of the prosecution's expert at trial.

¶ 96    Defendant claims the postconviction court used an improper legal standard when it wrote that the testimony of the expert who testified at the Crim. P. 35(c) hearing "would not have changed the outcome" of the trial. Considering the court properly quoted the standard repeatedly in other contexts, it appears the court was simply trying to summarize the proper standard at the end of a long order.

¶ 97    Defendant asserts that more comprehensive medical testimony and cross-examination was necessary because "the entirety of the case rested on [the victim's] credibility." But, again, this assertion ignores the incriminating statements defendant made to K.C. at the restaurant.

4.    Defendant's Statements at the Restaurant

¶ 98    Defendant asserts Silver and Frerich's "handling" of defendant's statements to K.C. at the restaurant was "deficient." They should have, he continues, "prepared" him "to testify as to his intent when he made each and every statement," arguing that he

"would have said anything" to prevent K.C. from calling the police and then falsely accusing him of sexual assault.

¶ 99    This contention is moot because it assumes defendant would have testified at trial. Defendant chose not to testify. And, as we concluded above, the record supports the postconviction court's determination that defendant did not satisfy his burden of proving (1) he was incompetent to decide whether he would testify at trial, and (2) his waiver of his right to testify was not knowing, voluntary, and intelligent.

### 5.    Counsel's Explanation of the Prosecution's Second Proposed Plea Disposition

¶ 100   During oral argument, defendant's appellate counsel indicated defendant raised an independent ineffective assistance of counsel claim in his addendum to the original Crim. P. 35(c) motion: Silver and Frerich were ineffective because they did not adequately explain to defendant that the prosecution's second proposed plea disposition included a determinate sentence to incarceration instead of an indeterminate one. (Recall we have already concluded the record supports the postconviction court's determination that

32

he understood the proposed plea disposition and knowingly rejected it.)

¶ 101   But defendant's addendum did not focus on the nature of Silver and Frerich's explanation of the offer; it focused on his alleged incompetency. For example, the addendum argued, "based on his incompetency as a result of alcohol dependence and intoxication leading up to a during the trial," he was unable "to rationally weigh the risks of trial," to make "informed decisions about whether to accept a favorable plea offer, or to decide the relative risks of pleading guilty or going to trial." Defendant later reaffirmed that his putative incompetency was the axle around which this contention spun in his reply to the prosecution's response to his Crim. P. 35(c) motion by repeating the language we quoted earlier in this paragraph.

¶ 102   "Allegations not raised in a Crim. P. 35(c) motion or during the hearing on that motion and thus not ruled on by the trial court are not properly before this court for review." *People v. Goldman*, 923 P.2d 374, 375 (Colo. App. 1996). Because defendant did not raise this issue before the postconviction court, we will not consider it.

## 6  Cumulative Error

¶ 103   Finally, defendant asserts his ineffective assistance of counsel claims rise to the level of cumulative error.  "For reversal to occur based on cumulative error, a reviewing court must identify multiple errors that collectively prejudice the substantial rights of the defendant, even if any single error does not.  Stated simply, cumulative error involves cumulative prejudice." *Howard-Walker v. People*, 2019 CO 69, ¶ 25 (citation omitted).

¶ 104   We have rejected all defendant's contentions of ineffective assistance of counsel, including claims that he was prejudiced by the postconviction court's putative errors.  We therefore reject his cumulative error claim.

## IV.   Disposition

¶ 105   The postconviction court's order is affirmed.

JUDGE FOX and JUDGE HARRIS concur.